UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MINOAN EXPERIENCE, INC., a Delaware corporation,<br><br>*Plaintiff*,<br><br>vs.<br><br>HOSTGPO SOLUTIONS, INC., a Delaware corporation,<br><br>*Defendant*. | No:<br><br>**COMPLAINT**<br><br>and<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Minoan Experience, Inc. ("Minoan"), by and through its undersigned attorneys, as and for its Complaint against defendant HostGPO Solutions, Inc. ("HostGPO"), alleges as follows:

## NATURE OF THE CASE

1. This is an antitrust and cybersquatting action. HostGPO has engaged in predatory anti-competitive conduct, including by entering into vertical agreements with suppliers to suppress competition in the market for one-stop platforms for buying vacation rental furnishings. HostGPO's misconduct also extends to direct efforts to impede Minoan's expansion by illegally registering the domain name Minoan.ca for no legitimate purpose.

2. HostGPO was the *first* one-stop platform for buying vacation rental furnishings, but that does not entitle it to be the *only* player in the market. When Minoan and others began to compete for HostGPO's customers, HostGPO unlawfully defended its market dominance by entering into anticompetitive contracts with no legitimate business purpose. Those contracts were designed to create barriers to healthy, legal competition.

3. The market for one-stop online marketplace platforms for the sale of home furnishings to short-term rental hosts should be robust, free, and economically dynamic. It arose

from the dramatic growth in short-term rentals. Starting in 2008, Airbnb revolutionized property rentals by opening people's homes to short-term guests. Instead of checking into a large hotel with sterile rooms, a guest could check into an Airbnb host's spare bedroom, apartment, or in-law unit. Guests loved the personal and curated design of hosts' spaces, and Airbnb succeeded because hosts brought their own distinctive aesthetic to each rental.

4. Minoan and other companies entered the market previously dominated by HostGPO by building a competing online platform where hosts can buy furnishings for their rentals.

5. In response to competitive threats from Minoan and others in the market, HostGPO entered into express, written agreements that illegally suppress competition. Using its dominant market position and monopoly power, HostGPO demands that furnishing suppliers sign contracts that forbid those suppliers from selling to any business offering services similar to those offered by HostGPO.

6. These contractual limits on competition apply even after termination of the contract. Even after a supplier ends its relationship with HostGPO, it is restricted from dealing with HostGPO's competitors—like Minoan—for twelve months *after* contract termination, effectively making suppliers choose between exiting the market or continuing to work with HostGPO. HostGPO uses those contracts to create barriers to entry into the market.

7. HostGPO also dictates the prices that suppliers can charge and discounts suppliers can offer any other customer. HostGPO brags about this on its website, stating there is "no need to shop around for better prices" because "we've negotiated all of our deals so that nobody else in the short-term rental industry can get a better discount than us from our partners."

8. HostGPO's anti-competitive practices cause harm to competition, and Minoan has been directly injured by HostGPO's anti-competitive actions.

**PARTIES, JURISDICTION AND VENUE**

9. Minoan is a Delaware corporation with a principal place of business in Jersey City, New Jersey.

10. Upon information and belief, HostGPO Solutions, Inc. is a Delaware corporation with a principal place of business in Los Angeles, California.

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Minoan's claims arise under the laws of the United States, including the Sherman Act, 15 U.S.C. §§ 1, 2 and 13, the Clayton Act, 15 U.S.C. §§ 15 and 26 and the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d).

12. This Court has personal jurisdiction over HostGPO, and venue is proper in this district, under 15 U.S.C. § 22 because at all relevant times HostGPO has transacted business in this district.

**FACTS**

*The Rise of Short-Term Retail Online Platforms Created*
*A Cohort of Short-Term Rental Hosts, Guests, and Suppliers.*

13. The market for short-term rentals exploded as Airbnb rose to prominence. While short-term rentals are not a new concept, Airbnb built an international, technology-powered network that standardized listings for rental hosts and reduced the time and costs expended by travelers planning their stays at short-term rentals.

14. Airbnb's network unlocked properties for rental use that otherwise lay dormant and increased rental traffic for existing rental properties. This significantly reduced costs for renters and increased profits for hosts.

15. Over the past 15 years or so, Airbnb and other platforms pursuing the same short-term rental model (*e.g.*, Vrbo and Booking.com) have experienced substantial growth. Analysts predict that the American market for short-term rentals will grow by 11% per year over the next decade.

16. Enterprising property owners capitalized on this growth. A new cohort of property owners joined as hosts in the short-term rental market. Because short-term rental platforms like Airbnb and Vrbo reduced transaction costs, hosts could generate short-term rental income from numerous sources and increase their profits from smaller rental spaces. Hosts listed single condos in multi-unit buildings or even individual rooms in otherwise occupied properties. Occasionally, hosts even rented their primary residences to short-term guests. And as this rental market grew, more and more single-family homes were being offered as short-term rentals.

17. As more and more guests chose these new forms of short-term rentals over more traditional options such as hotels, hosts had incentives to make their rentals more attractive to potential guests. This is particularly true because photos of each rental space are prominently displayed on the online rental platforms. Guests viewing these photos as they sort through their options often choose their rentals based on the overall "look and feel" of the rental space. This means that hosts who operate short-term rental properties can compete more successfully with other short-term rentals and hotel rooms by enhancing the appearance and aesthetics of their properties.

18. Hosts make their properties stand out among the myriad of choices by focusing on and enhancing the designs, furnishings, and overall aesthetics of these properties, thereby giving each property a unique look and feel. In a world where purchasing decisions are increasingly made online, a property that looks visually unique and inviting when viewed online will receive more bookings.

19. In sharp contrast, a large hotel generally furnishes dozens or hundreds of rooms identically within one building—leading to a uniform but uninspired interior design. The short-term rental market attracts guests looking for a more intimate and idiosyncratic stay. In the words of HostGPO's CEO, Jeff Iloulian, short-term rental hosts created "unique space[s]" that capitalize on "local experience."

20. In addition to enhancing the design and aesthetics of their properties, short-term rental owners also need to ensure that the furnishings in these rentals are durable enough to absorb the high level of traffic that flows through these properties. When a single rental space is being used by many guests in any given month or year, there is substantial wear-and-tear on the furnishings. Accordingly, hosts need to purchase furnishings that can withstand prolonged use better than furnishings designed for a homeowner or a long-term renter. Such furnishings are referred to as "commercial-grade." As stated by HostGPO, high-volume properties are frequently occupied by guests who "drive" rental properties "like a rental car," thereby placing substantial wear-and-tear on furnishings.

21. There are several home furnishing suppliers that sell both residential-grade and commercial-grade furnishings. For example, companies such as West Elm sell residential-grade furnishings to consumers via retail stores or online sales, and they also sell commercial-grade furnishings more suited to short-term rental properties. Commercial short-term rental hosts rely on sales from these suppliers to reduce the time, effort, and costs related to searching retail stores for acceptable furnishings. Commercial short-term rental hosts also need specific, host-friendly supply terms, like direct shipping and fast delivery, to reduce the number of nights that properties are unavailable due to furnishing replacement.

22. The market for one-stop online marketplace platforms for the sale of home furnishings to commercial short-term rental hosts is unique. Only a "select" few home furnishing companies supply products that are "ideal for short-term rentals." And providing a single business-to-business platform to compare and purchase furnishings saves commercial short-term rental hosts time, reduces transaction costs, and makes it easier to scale purchasing for several short-term properties.

### *HostGPO Collects Monopoly Power In The Market.*

23. A GPO is a "group purchasing organization," where a large group combines to negotiate supply contracts collectively.

24. HostGPO was founded in 2019 by Jeff Iloulian, who merely applied the idea of group purchasing to the market for commercial short-term rental furnishings. For a subscription fee, HostGPO admits commercial short-term rental hosts into the GPO. But HostGPO does not admit every casual consumer who wants to buy furnishings. HostGPO targets commercial short-term rental hosts: those who have three or more rental properties and those who want to scale up their rental operations. HostGPO has an interview process to weed out casual shoppers and non-commercial hosts. Once admitted into the GPO, hosts may purchase furnishings directly from suppliers on HostGPO's website.

25. HostGPO attracts commercial short-term rental hosts across the country by offering discounts from the retail price on furnishings. HostGPO negotiates discounts on furnishings for HostGPO's members. According to HostGPO, those discounts can be as large as 30 percent to 75 percent off the retail price. HostGPO has negotiated supply contracts for its members with furnishing suppliers, including Williams-Sonoma, Brooklinen, West Elm, Home Depot, Rugs USA, Standard Textile, Public Goods, Crate & Barrel, World Amenities, Article, and Helix.

26. With the promise of these discounts, HostGPO amassed a legion of commercial short-term rental hosts who operate hundreds of thousands of properties. HostGPO's "thousands and thousands" of members currently represent over 300,000 properties.

27. HostGPO makes money by charging commercial short-term rental hosts a subscription fee to be members of the GPO. Currently, HostGPO charges members $120 per year, $420 per year, or an indeterminate amount of money for a "custom" membership. With tens of thousands of members paying more than $100 per year, HostGPO earns millions of dollars in revenue. Its revenue from subscription fees is lucrative, and HostGPO has incentive to continue to attract and retain as many commercial short-term rental hosts into the GPO as possible.

*Minoan Enters the Market.*

28. In 2020, Marc Hostovsky founded Minoan. Like HostGPO, Minoan offers a

platform for short-term rental hosts to buy furnishings they love. Backed by a high volume of commercial short-term rental hosts, Minoan is able to negotiate discounts with furnishing suppliers. Then, Minoan allows commercial short-term rental hosts to buy these suppliers' furnishings on its platform.[1] Minoan charges no membership fee.

29. Minoan contracts or has attempted to contract with many furnishing suppliers like Article, Brooklinen, Helix, World Amenities, and Public Goods.

30. Despite its innovations, Minoan is a younger company than HostGPO, and HostGPO still dominates the market, with members owning or managing over 300,000 rental properties in the United States. Other online marketplace platforms providing one-stop shopping experiences for short-term rental furnishings sold to commercial hosts, like IN-HOUSE and Inhaven, are much smaller.

### *HostGPO Demands Anticompetitive, Monopolistic Agreements.*

31. HostGPO does not want to compete against other companies offering platforms where commercial short-term rental hosts can buy furnishings. Its business relies on acquiring "a massive amount of members," and fair competition therefore threatens its business model. HostGPO's stated goal is to capture "every professional vacation rental operator, business or individual, operating three or more vacation rental units."

32. To stamp out competition, HostGPO enters into anticompetitive contracts with furnishing suppliers, creating a barrier to entry into the market. Three contract terms in particular are anticompetitive and serve no procompetitive justification: exclusive dealing, agreements not to deal with competitors *after* contract termination, and unlawful price restraints.

---

[1] This is sometimes called the "B2B" (or "business to business") side of Minoan's business model that competes with HostGPO. Minoan also sells to short-term rental guests. After commercial short-term rental hosts buy furnishings from Minoan, they may also use their rentals to display furnishings that guests may buy. Hosts can place QR codes next to goods available on Minoan's website. When a guest scans a QR code, Minoan directs her to a platform where she may buy the item directly. This is sometimes called the "B2B2C," or "business to business to consumer" side of Minoan's business model. HostGPO does not compete with this portion of Minoan's business model.

33. **Exclusive dealing**.  HostGPO enters into contracts that prohibit suppliers from dealing with HostGPO's competitors. For example, HostGPO signed contracts that force the supplier to agree "that it shall not enter into any similar agreement with another party providing services similar to those of HostGPO, or any other group purchasing organization representing furnished housing or vacation rental companies, without HostGPO's prior written consent during the Term or for a period of one (1) year after the expiration or termination of the Term under this Agreement."

34. The exclusive dealing provisions foreclose HostGPO's competitors, including Minoan, from being able to offer products from leading suppliers for sale on platforms other than HostGPO.

35. **Post-Termination Non-Compete Clauses**. Notably, HostGPO's exclusive dealing provisions prohibit a supplier from dealing with HostGPO's competitors not only during the term of the agreement with HostGPO, *but also for one year after the agreement ends*. ("Post-Termination Non-Compete Clauses.") Thus, for one year after ending a HostGPO agreement, furnishing suppliers cannot sell to any platform for commercial short-term rental hosts at all. Those provisions restrict competition among platforms that sell furnishings to commercial short-term rental hosts. There can be no justification for Post-Termination Non-Compete Clauses other than to prevent HostGPO's competitors from gaining market share in a market dominated by HostGPO.

36. Post-Termination Non-Compete Clauses force suppliers to choose: either continue to have access to HostGPO and the industry's largest customer base or abandon all sales in the market for one year. The Post-Termination Non-Compete Clauses significantly diminishes any incentive for a supplier to switch from HostGPO to Minoan.

37. **Unlawful price restraints**.  HostGPO enters into contracts with a "no price competition clause" ("NPCC") that restricts its suppliers' ability to compete on price via other outlets.  For example, HostGPO signed contracts that require that a supplier's prices at "all times,

be at least as good as those offered to any other customer which purchases comparable volume of [p]roducts relative to the volume purchased" by HostGPO members.

38.	HostGPO's NPCC terms effectively fix the prices that suppliers can offer other customers by setting a price floor, limiting the discounts that suppliers can offer. While HostGPO's exclusive dealing terms prohibit suppliers from dealing with HostGPO's competitors, the NPCC terms apply to all of the suppliers' customers.

39.	This "most-favored-nation" status is key to maintaining HostGPO's membership. HostGPO guarantees "that no other group within the STR [short-term rental] industry can get you a better deal with our partners." HostGPO touts the fact that it walls off competition, boasting in its advertising, "[w]e've negotiated all of our deals so that nobody else in the short-term rental industry can get a better discount than us from our partners." Therefore, HostGPO tells the market, "there is no need to shop around" because "[w]e guarantee that our deal is always the best deal there is."

### *HostGPO Cybersquats Using Minoan's Mark.*

40.	Minoan began using its common law service mark—"Minoan" (the "Mark")—in commerce by at the latest March 1, 2020.

41.	Minoan applied for a federal service mark registration for the Mark on November 20, 2020. Minoan's service mark application was published by the United States Patent and Trademark Office ("USPTO") in the Trademark Official Gazette on March 29, 2022. The USPTO issued a service mark registration for the Mark on June 14, 2022, Registration Number 6756689.

42.	Minoan is informed and believes and based thereon alleges that HostGPO learned of Minoan's application, registered the domain name Minoan.ca (the "Domain Name") on June 13, 2022, and updated or renewed its registration of the Domain Name on June 14, 2024. The Internet Corporation for Assigned Names and Numbers ("ICANN") assigned to HostGPO the Registry Domain ID 106865509-CIRA. According to records maintained by ICANN, the Domain Name was registered by Eric Leitman for HostGPO, using his HostGPO email address,

eric@hostgpo.com.

43. At the time that HostGPO registered the Domain Name, the Mark was distinctive and had been used in commerce for more than two years. Prior to registration, the Mark was protected as a common law mark.

44. In registering the Domain Name, HostGPO acted with a bad faith intent to profit from Minoan's Mark. Minoan competes with HostGPO in the market for one-stop platforms for buying vacation rental furnishings. On information and belief, HostGPO knew of Minoan's use of the Mark, learned of Minoan's application for registration of a federal service mark, and squatted on the Domain Name using Minoan's Mark and legal name. On information and belief, HostGPO had no intention of any *bona fide* offering of goods and services using the Domain Name, and HostGPO registered the Domain Name with the intent and for the purpose of preventing consumers from visiting Minoan's website, diverting them from Minoan, and increasing HostGPO's revenue, through confusion as to the source, sponsorship, affiliation or endorsement of goods and services. HostGPO had no basis to believe that registration of the Domain Name was a fair use or otherwise was lawful.

45. HostGPO's activities as alleged herein violate the federal Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1).

## FIRST CAUSE OF ACTION

### Sherman Act, Section 1 (15 U.S.C. § 1)[2]

46. Minoan repeats, reiterates, and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

47. HostGPO and Minoan, as well as other companies, compete in interstate

---

[2] Minoan previously filed federal antitrust claims the First through Third Causes of Action herein as part of its cross-complaint to a litigation initiated by HostGPO in the Los Angeles Superior Court Case No. 24STCV08279. Minoan agreed to dismissal of those claims without prejudice and with the express reservation of rights to assert these claims in federal court.

commerce in the market for one-stop online marketplace platforms for the sale of home furnishings to commercial short-term rental hosts (the "Market").

48. The commercial offerings by HostGPO and Minoan to commercial short-term rental hosts are reasonably interchangeable. While HostGPO and Minoan have different business models, from the perspective of commercial short-term rental hosts that use those platforms (and others within the Market) the offerings are roughly equivalent and commercial short-term rental hosts can use either platform, or a platform of one of their competitors, as a one-stop shopping source for home furnishings for their short-term rental units.

49. The commercial offerings by HostGPO and Minoan (and others within the Market) are also characterized by a cross-elasticity of demand. If one platform competing in the Market has higher prices than a competitor, commercial short-term rental hosts can easily determine that fact and shift their buying to another platform, reducing demand for the platform offering higher prices and increasing the demand for the platform offering lower prices. Similarly, if one platform has substantially more variety in suppliers, commercial short-term rental hosts can easily shift their buying to the platform with the greater number of offerings.

50. As described more fully above, HostGPO has written, contractual agreements with home furnishing suppliers that impose unreasonable restraints on trade, and have an anticompetitive effect on the Market, under a rule of reason analysis. Those provisions include exclusive dealing, Post-Termination Non-Compete Clauses, and NPCCs.

51. Through its membership comprising over 300,000 rental properties, HostGPO has market power in the Market such that its unreasonable restraints on trade and anticompetitive conduct have substantially lessened competition or tended to create a monopoly.

52. HostGPO's ability to impose and enforce NPCCs and exclusivity provisions, including Post-Termination Non-Compete Clauses, evidence HostGPO's market power.

53. HostGPO has no legitimate procompetitive justification for its anticompetitive exclusive dealing, price restraints, and Post-Termination Non-Compete Clauses.

54. HostGPO's anticompetitive terms affect a substantial amount of interstate commerce by limiting price competition, by restricting supplier mobility and, as a result, inhibiting competition from competitors in the Market.

55. Minoan has suffered antitrust injury in the relevant market because HostGPO's exclusivity, and Post-Termination Non-Compete Clauses, and NPCCs have injured Minoan's business.

56. Minoan is an efficient and appropriate enforcer of the antitrust laws in these circumstances. The reduction in price competition through competing platforms, together with the practical impossibility of suppliers switching platforms, means that commercial short-term rental hosts and guests will also continue to suffer injury in the form of higher prices, decreased choice (*e.g.*, the inability to offer guests the opportunity to purchase furnishings through Minoan's platform), and lower quality if HostGPO's conduct is not remedied.

57. HostGPO's anticompetitive conduct has caused Minoan actual damages through lower supplier discounts leading to restraints on Minoan's ability to compete with HostGPO and other competitors on price, restrained ability to offer diversity of products, and fewer suppliers with which it can grow its platform.

58. Minoan was directly injured by HostGPO's anti-competitive behavior. For example, Minoan lost sales because suppliers (such as Society6 and Article) restricted discounts to be provided to Minoan based on HostGPO's price restraints and other illegal practices. Minoan expects that discovery will reveal a market-wide harm to free competition.

59. HostGPO's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition and therefore no adequate remedy exists at law and HostGPO's unlawful conduct will continue unless enjoined.

60. By reason of the foregoing, HostGPO has violated Section 1 of the Sherman Act.

61. By reason of the foregoing, Minoan is entitled to a money judgment against HostGPO in an amount to be determined at trial, including costs and attorneys' fees to the fullest

extent permissible by law, as well as injunctive relief prohibiting HostGPO from continuing to engage in the anticompetitive conduct described herein.

62. Under Section 4 of the Clayton Act, 15 U.S.C. § 15, Minoan is entitled to treble damages for injuries caused by HostGPO's violation of the Sherman Act, and an award of its costs of suit, including attorneys' fees. Under Section 16 of the Clayton Act, 15 U.S.C. § 26, Minoan is also entitled to injunctive relief.

## SECOND CAUSE OF ACTION

### Monopolization; Sherman Act, Section 2 (15 U.S.C. § 2)

63. Minoan repeats, reiterates, and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

64. Through its membership comprising over 300,000 rental properties, HostGPO possesses monopoly power in the Market.

65. HostGPO, through the exercise of its power in the Market, is able to impose exclusive dealing provisions, provisions that restrain price competition, and provisions that block competition upon suppliers. That conduct is anticompetitive and exclusionary, allowing HostGPO to willfully maintain its monopoly power.

66. HostGPO's maintenance of its monopoly power is not a consequence of a superior product, business acumen, or historical accident. HostGPO's ability to impose and enforce NPCCs and exclusivity provisions, and Post-Termination Non-Compete Clauses, together with HostGPO's dominant position in the Market are evidence of HostGPO's monopoly power.

67. HostGPO has no legitimate procompetitive justification for its anticompetitive exclusive dealing, price restraints, and Post-Termination Non-Compete Clauses.

68. HostGPO's exclusionary conduct has affected and continues to affect a substantial amount of interstate commerce by limiting price competition, restricting supplier mobility, and foreclosing innovation and access to the benefits of competing platforms.

69. Minoan has suffered antitrust injury in the Market because of HostGPO's NPCCs and its exclusivity and termination provisions. As a competing platform provider, Minoan is an efficient and appropriate enforcer of the antitrust laws in these circumstances. The reduction in price competition through competing platforms, together with the practical impossibility of switching platforms, means that commercial short-term rental hosts and guests will also continue to suffer antitrust injury in the form of higher prices, decreased choice (*e.g.*, the ability to offer guests the opportunity to purchase furnishings through Minoan's platform), and lower quality if HostGPO's conduct is not remedied. Furnishing suppliers in the Market will also continue to suffer antitrust injury from the foreclosure of innovative and competitive platforms like Minoan's, which will continue to result in fewer sales and decreased profits if HostGPO's conduct is not remedied.

70. HostGPO's anticompetitive conduct has caused Minoan antitrust injury in the form of actual damages through lower supplier discounts, restrained ability to advertise, and fewer suppliers with which Minoan can grow its platform.

71. HostGPO's violations have deprived, and will continue to deprive, consumers and the Market of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and HostGPO's unlawful conduct will continue unless enjoined.

72. By reason of the foregoing, HostGPO has violated Section 2 of the Sherman Act.

73. By reason of the foregoing, Minoan is entitled to a money judgment against HostGPO in an amount to be determined at trial, including costs and attorneys' fees to the fullest extent permissible by law, as well as injunctive relief prohibiting HostGPO from continuing to engage in the anticompetitive conduct described herein.

74. Under Section 4 of the Clayton Act, 15 U.S.C. § 15, Minoan is entitled to treble damages for injuries caused by HostGPO's violation of the Sherman Act, and an award of its costs of suit, including attorneys' fees. Under Section 16 of the Clayton Act, 15 U.S.C. § 26, Minoan is also entitled to injunctive relief.

## THIRD CAUSE OF ACTION

**Attempted Monopolization; Sherman Act, Section 2 (15 U.S.C. § 2)**

75. Minoan repeats, reiterates, and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

76. HostGPO, through the exercise of its power in the Market, is able to impose exclusive dealing provisions, provisions that restrain price competition, and provisions that block competition upon suppliers.

77. HostGPO's imposition and enforcement of NPCCs and exclusivity provisions, including Post-Termination Non-Compete Clauses, constitutes predatory and anticompetitive conduct.

78. Upon information and belief, HostGPO engaged in this predatory and anticompetitive conduct with the specific intent to monopolize the Market.

79. Through its membership comprising over 300,000 rental properties, HostGPO possesses sufficient power in the Market such that it has a dangerous probability of success of monopolizing the Market.

80. HostGPO has no legitimate procompetitive justification for its anticompetitive exclusive dealing, price restraints, and Post-Termination Non-Compete Clauses.

81. HostGPO's exclusionary conduct has affected and continues to affect a substantial amount of interstate commerce by limiting price competition, by restricting supplier mobility, and by foreclosing innovation and access to the benefits of competing platforms.

82. Minoan has suffered competitive injury in the Market because of HostGPO's NPCCs and its exclusivity and termination provisions, and as a competing platform provider, is an efficient and appropriate enforcer of the antitrust laws in these circumstances. The reduction in price competition through competing platforms, together with the practical impossibility of switching platforms, means that commercial short-term rental hosts and guests will continue to suffer antitrust injury in the form of higher prices, decreased choice (*e.g.*, the ability to offer

guests the opportunity to purchase furnishings through Minoan's platform), and lower quality if HostGPO's conduct is not remedied. Furnishing suppliers in the Market will continue to suffer antitrust injury from the foreclosure of innovative and competitive platforms like Minoan's, which will continue to result in fewer sales and decreased profits if HostGPO's conduct is not remedied.

83. HostGPO's anticompetitive conduct resulted in actual antitrust damages to Minoan through lower supplier discounts, restrained ability to advertise, and fewer suppliers with which Minoan can grow its platform.

84. HostGPO's violations have deprived, and will continue to deprive, consumers and the industry of the benefits of competition, including innovation, and therefore no adequate remedy exists at law and HostGPO's unlawful conduct will continue unless enjoined.

85. By reason of the foregoing, HostGPO has violated Section 2 of the Sherman Act.

86. By reason of the foregoing, Minoan is entitled to a money judgment against HostGPO in an amount to be determined at trial, including costs and attorneys' fees to the fullest extent permissible by law, as well as injunctive relief prohibiting HostGPO from continuing to engage in the anticompetitive conduct described herein.

87. Under Section 4 of the Clayton Act, 15 U.S.C. § 15, Minoan is entitled to treble damages for injuries caused by HostGPO's violation of the Sherman Act, and an award of its costs of suit, including attorneys' fees. Under Section 16 of the Clayton Act, 15 U.S.C. § 26, Minoan is also entitled to injunctive relief.

## FOURTH CAUSE OF ACTION

**Violation of the Anti-Cybersquatting Consumer Protection Act (15 U.S.C. § 1125(d)(1))**

88. Minoan repeats, reiterates, and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

89. Minoan is the owner the Mark, issued by the USPTO on June 14, 2022, based on an application filed on November 20, 2020. Minoan's service mark application was published

by the USPTO in the Trademark Official Gazette on March 29, 2022.

90. Minoan is informed and believes and based thereon alleges that HostGPO registered the Domain Name (Minoan.ca) on June 13, 2022, and updated or re-registered its registration of the Domain Name on June 14, 2024.

91. At the time that HostGPO registered, updated or re-registered the Domain Name, the Mark was distinctive and had been used in commerce for more than two years. Prior to registration as a federal service mark, the Mark was protected as a common law mark.

92. In registering the Domain Name, HostGPO acted in bad faith, with an intent to profit from Minoan's Mark. Minoan is informed and believes and based thereon alleges that HostGPO registered the Domain Name with the intent and for the purpose of diverting consumers from Minoan, thereby creating a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of goods and services. HostGPO had no basis to believe that registration of the Domain Name was a fair use or otherwise was lawful.

93. HostGPO's activities as alleged herein violate the federal Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1).

94. On information and belief, Minoan has been damaged, and HostGPO has been unjustly enriched, by HostGPO's actions.

95. HostGPO's acts have caused and will continue to cause irreparable injury to Minoan. Minoan has no adequate remedy at law.

**WHEREFORE**, Minoan respectfully requests that the Court enter judgment in its favor and against HostGPO, as follows:

1. As to the First, Second, and Third Causes of Action:

    a. For an award of damages according to proof;

    b. For treble damages;

    c. For a preliminary and permanent injunction enjoining HostGPO from continuing to engage in its illegal conduct as described herein; and

      d. For an award of Minoan's reasonable costs, including attorneys' fees.

2. As to the Fourth Cause of Action:

      a. For a judicial declaration that HostGPO has engaged in Cybersquatting in violation of the Anti-Cybersquatting Consumer Protection Act;

      b. For an order that, upon Minoan's request, the Internet Registries shall take all actions necessary to ensure that the Domain Name be transferred to Minoan;

      c. For a preliminary and permanent injunction enjoining HostGPO from Cybersquatting by registering domain names using Minoan's Mark;

      d. For actual damages, or alternatively at Minoan's election an award of statutory damages for HostGPO's Cybersquatting in an amount between $1,000 and $100,000;

      e. For injunctive Relief in the form of an order requiring HostGPO to transfer the Domain Name to Minoan, and/or for an order that, upon Minoan's request, the Internet registries shall take all actions necessary to ensure that the Domain Name be transferred to Minoan; and

      f. For an award of Minoan's legal fees and costs incurred in seeking relief.

3. As to all causes of action, for such other relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Minoan hereby demands a jury trial on all triable issues raised in the Complaint.

Dated: October 22, 2025

                                                                                                                               LACHTMAN COHEN & BELOWICH LLP
                                                                                                                               By: */s/ Gregory A. Blue*
                                                                                                                               Gregory A. Blue
                                                                                                                               1133 Westchester Avenue, Suite N-200
                                                                                                                               White Plains, NY 10604
                                                                                                                               Email: gblue@lcb-law.com
                                                                                                                               Tel: (914) 505-6654

                                                                                                                               *Attorneys for Plaintiff*
                                                                                                                               *Minoan Experience, Inc.*